UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

ON FIRE CHRISTIAN CENTER, INC.                                PLAINTIFF

v.                                CIVIL ACTION NO. 3:20-CV-264-JRW

GREG FISCHER, et al.                                          DEFENDANTS

## TEMPORARY RESTRAINING ORDER

1.      The Court **GRANTS** the motion for a temporary restraining order filed by On Fire

Christian Center, Inc. ("On Fire") against Mayor Greg Fischer and the City of Louisville (together,

"Louisville").

2.      The Court **ENTERS** this Temporary Restraining Order on Saturday, April 11, 2020

at 2:00 P.M.[1]

3.      The Court **ENJOINS** Louisville from enforcing; attempting to enforce; threatening

to enforce; or otherwise requiring compliance with any prohibition on drive-in church services at

On Fire.[2]

4.      Unless the Court enters this Temporary Restraining Order, the members of On Fire

will suffer irreparable harm.[3] The government plans to substantially burden their religious practice

on one of the most important holidays of the Christian calendar, Easter Sunday.[4]

---

[1] Fed. R. Civ. P. 65(b)(2).
[2] As a general rule, a court's injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  But Louisville ought not to view the limits of this injunction as a green light to violate the religious liberty of non-parties. *Cf.* 42 U.S.C. § 1983.
[3] *Id.*
[4] DN 1 ¶ 13.

1

5.      Notice to Louisville before entering this Temporary Restraining Order isn't necessary.[5]  The facts in On Fire's affidavit "clearly show that immediate and irreparable injury, loss, or damage will result to [On Fire] before [Louisville] may be heard in opposition."[6]  J. Brooken Smith, On Fire's lawyer, certified that he sent Louisville a letter yesterday detailing their potential claims but didn't hear anything back.[7]

6.      The Court issued this Temporary Restraining Order without notice because Easter Sunday is less than one day away.[8]  Providing notice to Louisville before entering this Temporary Restraining Order would be impractical in such a short period of time.

7.      On Fire does not need to post a security because enjoining Louisville from prohibiting drive-in church services at On Fire doesn't interfere with Louisville's rights.[9]

8.      The Court **GRANTS** On Fire's request for Oral Argument.  The Court will hold a telephonic hearing on the preliminary injunction motion on **April 14, 2020** at **11:00 A.M.**  Counsel shall email Ms. Megan Jackson at Megan_Jackson@kywd.uscourts.gov for the hearing's call-in number and access code.  Members of the public interested in listening to the hearing may also email Ms. Jackson.

9.      The Court **ORDERS** On Fire's lawyers to serve a copy of this Temporary Restraining Order and Opinion on Mike O'Connell, Jefferson County Attorney.

Justin R Walker, District Judge
United States District Court

4/11/2020

---

[5] Fed. R. Civ. P. 65(b)(1).
[6] Fed. R. Civ. P. 65(b)(1)(A).
[7] Fed. R. Civ. P. 65(b)(1)(B); DN 3-1 #43.
[8] Fed. R. Civ. P. 65(b)(2).
[9] Fed. R. Civ. P. 65(c).

**<u>MEMORANDUM OPINION</u>**

On Holy Thursday, an American mayor criminalized the communal celebration of Easter.

That sentence is one that this Court never expected to see outside the pages of a dystopian novel, or perhaps the pages of *The Onion*.  But two days ago, citing the need for social distancing during the current pandemic, Louisville's Mayor Greg Fischer ordered Christians not to attend Sunday services, even if they remained *in their cars* to worship – and even though it's *Easter*.

The Mayor's decision is stunning.

And it is, "beyond all reason," unconstitutional.[10]

$$*\qquad*\qquad*$$

According to St. Paul, the first pilgrim was Abel.  With Enoch, Noah, Abraham, Isaac, Jacob, and Sara, they "died in faith, not having received the promises" of God's promised kingdom.[11]  But they saw "them afar off, and were persuaded of them, and embraced them, and confessed that they were strangers and pilgrims on the earth."[12]

The Plymouth Colony's second Governor, William Bradford, alluded to St. Paul's pilgrims when he recalled, years later, his fellow colonists' departure from England.  The land they were leaving was comfortable and familiar.  The ocean before them was, for them, unknown and dangerous.  So too was the New World, where half would not survive the first winter.[13]  There

---

[10] *Cf. Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905).

[11] Hebrews 11:13.

[12] *Id.*

[13] Patricia Deetz and James Deetz, *Mayflower Passenger Deaths, 1620-1621,* THE PLYMOUTH COLONY ARCHIVE PROJECT (Dec. 14, 2007), http://www.histarch.illinois.edu/plymouth/Maydeaths.html.

were "mutual embraces and many tears," as they said farewell to sons, daughters, mothers, and fathers, too young or old or fearful or frail to leave the Old World.[14]

But they sailed west because west was where they would find what they wanted most, what they needed most: the liberty to worship God according to their conscience.  "They knew they were pilgrims," wrote Bradford, "and looked not much on those things" left behind, "but lifted their eyes to heaven, their dearest country and quieted their spirits."[15]

The Pilgrims were heirs to a long line of persecuted Christians, including some punished with prison or worse for the crime of celebrating Easter[16] – and an even longer line of persecuted peoples of more ancient faiths.[17]  And although their notions of tolerance left more than a little to be desired,[18] the Pilgrims understood at least this much: *No* place, not even the unknown, is worse than *any* place whose state forbids the exercise of your sincerely held religious beliefs.

The Pilgrims' history of fleeing religious persecution was just one of the many "historical instances of religious persecution and intolerance that gave concern to those who drafted the Free

---

[14] WILLIAM BRADFORD, HISTORY OF PLYMOUTH COLONY 60 (Charles Deane, 1948) https://www.google.com/books/edition/History_of_Plymouth_Plantation/tYecOAN1cwwC?hl=en&gbpv=1&dq=inauthor:%22WILLIAM+BRADFORD%22&printsec=frontcover.
[15] *Id.* at 59 (modernized).
[16] Tacitus' *Annals* 15:44, *available at* http://www.perseus.tufts.edu/hopper/text?doc=Tac.+Ann.+15.44&redirect=true.
[17] *See, e.g.*, *Exodus* 1:11-18.
[18] Nathaniel Philbrick, *Mayflower* 177 (2006) ("It was the Puritans who led the way in persecuting the Quakers, but the Pilgrims were more than willing to follow along.  As a Quaker sympathizer acidly wrote, the 'Plymouth-saddle is on the Bay horse,' and in 1660 Isaac Robinson, son of the late pastor John Robinson, was dis-enfranchised for advocating a policy of moderation to the Quakers.").

Exercise Clause" of our Constitution's First Amendment."[19]  It provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."[20]

At the time of that Amendment's ratification, religious liberty was among the American experiment's most audacious guarantees.  For millennia, soldiers had fought and killed to impose their religious doctrine on their neighbors.  A century before America's founding, in Germany alone, religious conflict took the lives of one out of every five men, women, and children.[21]  But not so in America.  "Among the reasons the United States is so open, so tolerant, and so free is that no person may be restricted or demeaned by government in exercising his or her religion."[22]

Of course, pockets of society have not always lived up to our nation's ideals.  Slave owners flogged slaves for attending prayer meetings.[23]  Murderous mobs drove the Latter Day Saints into Utah.[24]  Bigotry toward Roman Catholics motivated a majority of states to enact Blaine Amendments.[25]  Harvard University created a quota system to admit fewer Jewish students.[26]  Five

---

[19] *Church of the Lukumi Balalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (quoting *Bowen v. Roy*, 476 U.S. 693, 703 (1986)).

[20] U.S. Const. amend. I; *see also*, U.S. Const. amend. XIV ("No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

[21] Jason Daley, *Researchers Catalogue the Grisly Deaths of Soldiers in the Thirty Years' War*, SMITHSONIANMAG.COM (Jun. 6, 2017), https://www.smithsonianmag.com/smart-news/researchers-catalogue-grisly-deaths-soldiers-thirty-years-war-180963531/.

[22] *Burwell v. Hobby Lobby*, 573 U.S. 682, 739 (2014) (Kennedy, J., concurring).

[23] Albert J. Raboteau, *The Secret Religion of the Slaves: They often risked floggings to worship God*, CHRISTIANITY TODAY https://www.christianitytoday.com/history/issues/issue-33/secret-religion-of-slaves.html (last accessed Apr. 11, 2020).

[24] *See Mormon Pioneers*, PIONEERS, https://www.bbc.co.uk/religion/religions/mormon/history/pioneers_1.shtml. (last accessed Apr. 11, 2020).

[25] *See* Jane G. Rainey, *Blaine Amendments*, THE FIRST AMENDMENT ENCYCLOPEDIA, https://www.mtsu.edu/first-amendment/article/1036/blaine-amendments (last accessed Apr. 11, 2020).

[26] *Anti-Semitism in the U.S.: Harvard's Jewish Problem*, JEWISH VIRTUAL LIBRARY, https://www.jewishvirtuallibrary.org/harvard-s-jewish-problem (last accessed Apr. 11, 2020).

decades ago, a former member of the racist, anti-Semitic, and anti-Catholic Ku Klux Klan sat on the Supreme Court.[27]  And just over three decades ago, another ex-Klansman was the Majority Leader of the United States Senate.[28]

Some of that bigotry was not state-sponsored.  But in recent years, an expanding government has made the Free Exercise Clause more important than ever.  It was not long ago, for example, that the government told the Supreme Court it can prohibit a church from choosing its own minister;[29] force religious business owners to buy pharmaceuticals they consider abortion-inducing;[30] and conscript nuns to provide birth control.[31]  Even after the Supreme Court vacated lower court decisions – by 9-0, 5-4, and 8-0 margins – the Free Exercise Clause remains a too-often-tested bulwark against discrimination toward people of faith, from religious cakemakers to religious preschoolers.[32]

This state of affairs has severe implications for religious Americans, because "freedom means that all persons have the right to believe or strive to believe in a divine creator and a divine law."[33]  But its importance extends beyond the liberty to worship.  It threatens liberty of all kinds. That's because, as de Tocqueville wrote, "religion, which among the Americans never directly

---

[27] Kat Eschner, *This Supreme Court Justice Was a KKK Member*, SMITHSONIAN MAG., Feb. 27, 2017     https://www.smithsonianmag.com/smart-news/supreme-court-justice-was-kkk-member-180962254/ (last accessed Apr. 11, 2020).
[28] *Robert C. Byrd, United States Senator*, https://www.britannica.com/biography/Robert-C-Byrd (last accessed Apr. 11, 2020).
[29] *See Hosanna Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 185 (2012).
[30] *See Hobby Lobby*, 573 U.S. at 691.
[31] *See Zubic v. Burwell*, 136 S.Ct. 1557 (2016).
[32] *See Masterpiece Cakeshop Ltd. v. Colorado Human Rights Comm'n*, 138 S.Ct. 1719 (2018); *Trinity Lutheran Church v. Comer*, 137 S.Ct. 2012 (2017).
[33] 573 U.S. at 736 (Kennedy, J., concurring).

takes part in the government of society, must be considered as the first of their political institutions; for if it does not give them the taste for liberty, it singularly facilitates use of it."[34]

*     *     *

That brings us to this case.  "As we are all painfully aware, our nation faces a public health emergency caused by the exponential spread of COVID-19, the respiratory disease caused by the novel coronavirus SARS-CoV-2."[35]  Four days ago, defendant Mayor of Louisville Greg Fischer said it was "with a heavy heart" that he was banning religious services, even if congregants remain in their cars during the service.[36]  He asserted, "It's not really practical or safe to accommodate drive-up services taking place in our community."[37]  Drive-through restaurants and liquor stores are still open.[38]

Two days ago, on Holy Thursday, the Mayor threatened church members and pastors if they hold a drive-in Easter service:

---

[34] Alexis De Tocqueville, *Democracy in America I* at 475, Eduardo Nolla (ed.) & James T. Schleifer (tr.) (2012); *cf.*, NORTHWEST ORDINANCE 1787 (those elected by our country's founding generation believed "religion" to be "necessary to … the happiness of mankind") available at https://www.visitthecapitol.gov/exhibitions/artifact/northwest-ordinance-1787 (last accessed Apr. 11, 2020).

[35] *In re Abbott*, 2020 WL 1685929 *2 (5th Cir. Apr. 7, 2020).

[36] DN 3-4 (Savannah Fadens & Ben Tobin, *Church vs. State: Can Kentucky Governments Block Religious Gatherings Amid COVID-19?*, LOUISVILLE COURIER J. (Apr. 9, 2020) https://www.courier-journal.com/story/news/2020/04/09/coronavirus-kentucky-    can-beshear-block-religious-gatherings/2972356001/ (last accessed April 9, 2020)).

[37] *Id.*

[38] Kentucky Attorney General Daniel Cameron has said, "As long as Kentuckians are permitted to drive through liquor stores, restaurants, and other businesses during the COVID-19 pandemic, the law requires that they must also be allowed to participate in drive-in church services, consistent with existing policies to stop the spread of COVID-19."  Otts, Chris.  FISCHER: POLICE WILL COLLECT LICENSE PLATES OF EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020).

- "We are not allowing churches to gather either in person or in any kind of drive-through capacity."[39]

- "Ok so, if you are a church or you are a churchgoing member and you do that, you're in violation of the mandate from the governor, you're in violation of the request from my office and city government to not do that."[40]

- "We're saying no church worshiping, no drive-throughs."[41]

The same day, the Mayor's spokesperson said he would use the police to deter and disburse drive-in religious gatherings: "Louisville Metro Police have been proactive about reaching out to those we've heard about, and discouraging organizers from proceeding."[42]  She added, perhaps in an effort to be less threatening, "This is not a law enforcement matter, it's a community matter."[43] But the Louisville Metro Police are not Peace Corps volunteers or community organizers; their job *is* law enforcement.  And the Mayor's spokesperson backed up the Mayor's threat to use the police with a request for "anyone who sees violations from our social distancing guidance to reach out to 311" to inform on their family, friends, and neighbors.[44]

Yesterday, on Good Friday, the Mayor's threats continued:

---

[39] DN 1 ¶ 27 (quoting Greg Fischer, *Daily COVID-19 Briefing By Louisville Mayor Greg Fischer* (Apr. 9, 2020), https://www.wave3.com/2020/04/09/fischer-confirms-new- cases-more-deaths/ (embedded video)).

[40] *Id.*

[41] *Id.*

[42] DN 3-4 (Savannah Fadens & Ben Tobin, *Church vs. State: Can Kentucky Governments Block Religious Gatherings Amid COVID-19?*, LOUISVILLE COURIER J. (Apr. 9, 2020) https://www.courier-journal.com/story/news/2020/04/09/coronavirus-kentucky-    can-beshear-block-religious-gatherings/2972356001/ (last accessed April 9, 2020)).

[43] *Id.*

[44] *Id.*; *cf.* George Orwell, 1984.

- "In order to save lives, we must not gather in churches, drive-through services, family gatherings, social gatherings this weekend."[45]

- "If there are gatherings on Sunday, Louisville Metro Police Department will be there on Sunday handing out information detailing the health risks involved, and I have asked LMPD to record license plates of all vehicles in attendance."[46]

- "We will share that information with our public health department, so they can follow up with the individuals that are out in church and gathering in groups, which is clearly a very, very unsafe practice."[47]

Today is Holy Saturday.  Tomorrow is Easter Sunday.  This is for Christians, as Mayor Fischer has said, "the holiest week of the year."[48]

On Sunday, tomorrow, Plaintiff On Fire Christian Center wishes to hold an Easter service, as Christians have done for two thousand years.  On Fire has planned a drive-in church service in

---

[45] COVID-19 Daily Briefing, 04-10-2020, https://www.facebook.com/MayorGregFischer/videos/514408469234775/.

[46] Otts, Chris.  FISCHER: POLICE WILL COLLECT LICENSE PLATES OF EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020).

[47] Otts, Chris.  FISCHER: POLICE WILL COLLECT LICENSE PLATES OF EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020); *cf.* Wheatley, Kevin. PARTICIPANTS IN WEEKEND GATHERINGS MUST SELF-QUARANTINE FOR 2 WEEKS, GOV. BESHEAR SAYS, WDRB.COM, https://www.wdrb.com/news/participants-in-weekend-gatherings-must-self-quarantine-for-2-weeks-gov-beshear-says/article_01fa77c6-7b72-11ea-90c7-7747ea013459.html (last accessed Apr. 10, 2020) ("License plate information will be collected from cars in parking lots by Kentucky State Police and forwarded to local health departments, who will then present an order to self-quarantine for 14 days at the owners' homes.").

[48] COVID-19 Daily Briefing, 04-10-2020, https://www.facebook.com/MayorGregFischer/videos/514408469234775/

9

accordance with the Center for Disease Control's social distancing guidelines.[49]  Yesterday, near

the close of business, On Fire filed this suit, including a request for a Temporary Restraining Order.

It has asked the Court to stop defendants Mayor Greg Fischer and Metro Louisville from carrying

out their plan to enforce their interpretation of the Governor's social distancing order.[50]

*        *        *

In reviewing a TRO motion, the Court considers whether:

1)  On Fire has a strong likelihood of success on the merits;

2)  On Fire would suffer irreparable injury without a TRO;

3)  The "balance of the equities" tips in On Fire's favor; and

4)  "[A]n injunction is in the public interest."[51]

On Fire can satisfy all four parts, and it is entitled to a Temporary Restraining Order.  The threats

against On Fire by the Mayor and Louisville Metro violate the First Amendment and Kentucky

law.

I.      **On Fire has demonstrated a strong likelihood of success on the merits on its two Free Exercise claims and its Kentucky statutory claims.**

---

[49] Centers for Disease Control & Prevention, SOCIAL DISTANCING, QUARANTINE, & ISOLATION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last accessed Apr. 11, 2020).

[50] There is doubt about the meaning of the Governor's social distancing order.  Kentucky Attorney General Daniel Cameron has said, "As long as Kentuckians are permitted to drive through liquor stores, restaurants, and other businesses during the COVID-19 pandemic, the law requires that they must also be allowed to participate in drive-in church services, consistent with existing policies to stop the spread of COVID-19." Otts, Chris.  FISCHER: POLICE WILL COLLECT LICENSE PLATES OF EASTER CHURCHGOERS, WDRB.com, https://www.wdrb.com/in-depth/fischer-police-will-collect-license-plates-of-easter-churchgoers/article_795c708a-7b6d-11ea-8e48-d7138b31add7.html (last accessed Apr. 10, 2020).  But what matters for this case is not what the Governor has purported to authorize the Mayor and the Louisville Metro Police Department to do; what matters is what the Mayor and the Police *are doing* and what state action is imminent.  *See Clapper v. ACLU*, 568 U.S. 398, 401 (2013).

[51] *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20 (2008); *see also*, *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (the Court considers the same factors in considering whether to grant a TRO or a preliminary injunction).

### A. On Fire has demonstrated a strong likelihood of success on its federal and state Free Exercise claims.

There is no doubt that society has the strongest of interests in curbing the growth of a deadly disease, which is the interest Mayor Fischer and Metro Louisville (together, "Louisville") has asserted when ordering churches and churchgoers to stay home on Easter. "When faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'"[52]

In this case, Louisville is violating the Free Exercise Clause "beyond all question."[53]

To begin, Louisville is substantially burdening On Fire's sincerely held religious beliefs in a manner that is not "neutral" between religious and non-religious conduct, with orders and threats that are not "generally applicable" to both religious and non-religious conduct.[54] "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause."[55]   In *Lukumi Babalu*, the City of Hialeah's ban on animal sacrifice was not "neutral" or "generally applicable" because it banned the Church of Lukumi Babalu's ritualistic animal sacrifices while at the same time it did not ban most other kinds of animal killing, including kosher slaughtering and killing animals for non-religious reasons.[56]

---

[52] *In re Abbott*, 2020 WL 1685929, at *7 (5th Cir. Apr. 7, 2020) (quoting *Jacobson*, 197 U.S. at 31).
[53] *Id.*; *see also, In re Abbott*, No. 20-50296, slip op. at 2-3 (5th Cir. Apr. 10, 2020).
[54] *Church of the Lukumi Balalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1990).
[55] *Id.* at 543.
[56] *Id.* at 536.

Here, Louisville has targeted religious worship by prohibiting drive-in church services, while not prohibiting a multitude of other non-religious drive-ins and drive-throughs – including, for example, drive-through liquor stores.  Moreover, Louisville has not prohibited parking in parking lots more broadly – including, again, the parking lots of liquor stores.  When Louisville prohibits religious activity while permitting non-religious activities, its choice "must undergo the most rigorous of scrutiny."[57]  That scrutiny requires Louisville to prove its interest is "compelling" and its regulation is "narrowly tailored to advance that interest."[58]

Louisville will be (highly) unlikely to make the second of those two showings.  To be sure, Louisville is pursuing a compelling interest of the highest order through its efforts to contain the current pandemic.  But its actions violate the Free Exercise Clause "beyond all question"[59] because they are not even close to being "narrowly tailored to advance that interest."[60]  As in *Lukumi Babalu*, the government's "proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree."[61]

In other words, Louisville's actions are "underinclusive" *and* "overbroad."[62]  They're underinclusive because they don't prohibit a host of equally dangerous (or equally harmless) activities that Louisville has permitted on the basis that they are "essential."  Those "essential" activities include driving through a liquor store's pick-up window, parking in a liquor store's

---

[57] *Id.*; *see also, id.* ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases.").

[58] *Id.* at 531-32.

[59] *In re Abbott*, 2020 WL 1685929, at *7 (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905)); *see also In re Abbott*, No. 20-50296, slip op. at 2-3 (Apr. 10, 2020 5th Cir.).

[60] 494 U.S. at 531-32

[61] *Id.* at 546.

[62] *Id.*

12

parking lot, or walking into a liquor store where other customers are shopping. The Court does not mean to impugn the perfectly legal business of selling alcohol, nor the legal and widely enjoyed activity of drinking it. But if beer is "essential," so is Easter.

Louisville's actions are also overbroad because, at least in this early stage of the litigation, it appears likely that Louisville's interest in preventing churchgoers from spreading COVID-19 would be achieved by allowing churchgoers to congregate in their cars as On Fire proposes. On Fire has committed to practicing social distancing in accordance with CDC guidelines. "Cars will park six feet apart and all congregants will remain in their cars with windows no more than half open for the entirety of the service."[63] Its pastor and a videographer will be the only people outside cars, and they will be at a distance from the cars.[64]

Louisville might suggest that On Fire members could participate in an online service and thus satisfy their longing for communal celebration. But some members may not have access to online resources. And even if they all did, the Free Exercise Clause protects their right to worship as their conscience commands them. It is not the role of a court to tell religious believers what is and isn't important to their religion, so long as their belief in the religious importance is sincere. The Free Exercise clause protects sincerely held religious beliefs that are at times not "acceptable, logical, consistent, or comprehensible to others."[65]

The Court does not doubt that Mayor Fischer can satisfy his sincerely held religious beliefs by watching a service on the Internet. Millions of Americans will do that this Easter, and the Court does not doubt that they will be true to their own faiths. Nothing in this Opinion should be read

---

[63] DN 3-2 ¶ 6.
[64] *Id.*
[65] 508 U.S. at 531 (quoting *Thomas v. Review Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981)).

to impugn the Mayor's motives or his faith.  Indeed, it is obvious he is trying to save lives.  But when considering the rights guaranteed by the Free Exercise Clause, it doesn't matter that the government burdening the religious practices of others "consists entirely of the pure-hearted, if the law it enacts in fact singles out a religious practice for special burdens."[66]

At the same time, the Court does not for a moment doubt that for some believers Easter means gathering together, if not hand in hand or shoulder to shoulder, then at least car fender to car fender.  Religion is not "some purely personal avocation that can be indulged entirely in secret, like pornography, in the privacy of one's room.  For most believers, it is *not* that, and has never been."[67]  Instead, just as many religions reinforce their faith and their bonds with the faithful through religious assemblies, many Christians take comfort and draw strength from Christ's promise that "where two or three are gathered together in My name, there am I in the midst of them."[68]  Indeed, as On Fire points out, "the Greek word translated 'church' in our English versions of the Christian scriptures is the word 'ekklesia,' which literally means 'assembly.'"[69]

It is true that On Fire's church members could *believe* in everything Easter teaches them from their homes on Sunday.  Soo too could the Pilgrims before they left Europe.  But the Pilgrims demanded more than that.  And so too does the Free Exercise Clause.  It "guarantees the free *exercise* of religion, not just the right to inward belief."[70]  That promise is as important for the minister as for those ministered to, as vital to the shepherd as to the sheep.  And it is as necessary now as when the *Mayflower* met Plymouth Rock.

---

[66] 508 U.S. at 559 (Scalia, J., concurring).
[67] *Lee v. Weisman*, 505 U.S. 577, 645 (1992) (Scalia, J., dissenting).
[68] Matthew 18:20.
[69] DN 1 ¶ 14 (quoting A.T. Robertson, A GRAMMAR OF THE GREEK NEW TESTAMENT IN LIGHT OF HISTORICAL RESEARCH (3d ed. 1919)).
[70] *Trinity Lutheran*, 137 S.Ct. at 2026 (Gorsuch, J., concurring).

14

Finally, nothing in this legal analysis should be read to imply that the rules of the road in constitutional law remain rigidly fixed in the time of a national emergency.  We know that from *Jacobson v. Massachusetts*.[71]  The COVID-19 pandemic has upended every aspect of our lives: how we work, how we live, how we celebrate, and how we mourn.  We worry about our loved ones and our nation.  We have made tremendous sacrifices.  And the Constitution is not "a suicide pact."[72]

But even under *Jacobson*, constitutional rights still exist.[73]  Among them is the freedom to worship as we choose.  The brief history at the outset of this opinion does not even scratch the surface of religious liberty's importance to our nation's story, identity, and Constitution.  But mindful of that importance, the Court believes there is a strong likelihood On Fire will prevail on the merits of its claim that Louisville may not ban its citizens from worshiping – or, in the relative safety of their cars, from worshiping together.[74]

> **B.  On Fire has also demonstrated a strong likelihood of success on its Kentucky statutory claim.**

---

[71] 197 U.S. 11 (1905); *see also In re Abbott*, 2020 WL 1685929 at *7 ("*Jacobson* remains good law.").

[72] *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

[73] *Id.* at 31 (emergency does not permit "beyond all question, a plain, palpable invasion of rights secured by the fundamental law"); *cf.* at 27 (… "an acknowledged power of a local community to protect itself against an epidemic threatening the safety of all might be exercised in particular circumstances and in reference to particular persons in such an *arbitrary, unreasonable manner*, or might go so far beyond what was reasonably required for the safety of the public, *as to authorize or compel the courts to interfere for the protection of such persons*.") (emphasis added); *id.* at 38 ("…the police power of a state, whether exercised directly by the legislature, or by a local body acting under its authority, may be exerted in such circumstances, or *by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression*.") (emphasis added).

[74] Since the Kentucky Supreme Court has held that the right to worship in its state Constitution is "in line with United States Supreme Court precedent" on the federal Free Exercise Clause, Louisville's ban is unconstitutional under state law, too.  *Gingerich v. Commonwealth*, 382 S.W.3d 835, 844 (Ky. 2012).

Kentucky's Religious Freedom Restoration Act prohibits Louisville from "substantially burden[ing] a person's freedom of religion."[75]  Louisville must prove "by clear and convincing evidence that [they have] a compelling interest in infringing the specific act [and have] used the least restrictive means to further that interest."[76]  As was true for non-neutral laws targeting religion, "judges in RFRA cases may question only the sincerity of a plaintiff's religious belief, not the correctness or reasonableness of that religious belief."[77]  And as with the strict scrutiny analysis in the constitutional context, to survive under RFRA the government must "show[] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases."[78]  And as above, banning drive-in church services isn't the least restrictive means to advance Louisville's interest in preventing the spread of coronavirus.  Moreover, if sitting in cars did pose a significant danger of spreading the virus, Louisville would close all drive-throughs and parking lots that are not related to maintaining public health, which they haven't done.[79]

Given the strong likelihood On Fire will succeed on its religious liberty claims, there is no need to address whether it will also succeed on its freedom-of-assembly claim.

---

[75] Ky. Rev. Stat. § 446.350.

[76] *Id.*

[77] *Priests for Life v. HHS*, 808 F.3d 1, 17 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of reh'g *en banc*) (citing *Hobby Lobby*, 134 S.Ct. at 2774 n.28, 2777-79; *Thomas*, 450 U.S. at 714-16), vac'd by *Zubik v. Burwell*, 136 S.Ct. 1557 (2016)); *see also Hobby Lobby*, 573 U.S. at 725 ("it is not for us to say that their religious beliefs are mistaken or insubstantial.  Instead, our 'narrow function … in this context is to determine' whether the line drawn reflects 'an honest conviction' ….") (quoting *Thomas*, 450 U.S. at 716).

[78] *Hobby Lobby*, 573 U.S. at 727.

[79] In the interest of moving on from the Court's example of liquor stores that are open, the Court takes judicial notice that ice cream shops (and their parking lots) are still open – to the relief of every sweet tooth in the city.

## II.      On Fire would suffer irreparable injury without a TRO.

"Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."[80]  Here, that is not difficult.  Protecting religious freedom was a vital part of our nation's founding, and it remains crucial today.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[81]

For Christians, there is nothing minimal about celebrating Easter, the holiest day in the Christian calendar.  And for the reasons explained above, the Court does not doubt that for them, an online substitute for an in-person, in-the-car celebration is no substitute at all.  On Fire "and its members have a sincerely held religious belief that physical corporate gathering of believers each Sunday, especially on Easter Sunday, is a central element of religious worship commanded by the Lord."[82]  Having to skip Easter Sunday would substantially burden On Fire's members' religious practice.[83]

## III.      The balance of the equities tips in On Fire's favor.

If the Court did not immediately intervene and stop Louisville's enforcement plan, churchgoers at On Fire would face an impossible choice: skip Easter Sunday service, in violation of their sincere religious beliefs, or risk arrest, mandatory quarantine, or some other enforcement action for practicing those sincere religious beliefs.  Unless a government action is far more narrowly tailored to a compelling government interest than is Louisville's, that is a choice no one

---

[80] *Winter*, 555 U.S. at 375.
[81] *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.").
[82] DN 3-2 ¶ 7.
[83] DN 3-2 ¶ 11.

in our nation should ever have to face.  Conversely, because Louisville allows other, non-religious and no-more-essential parking and drive-throughs, there is not yet any evidence in the record that stopping Louisville from enforcing its unconstitutional order will do it any harm.

**IV.      A TRO is in the public interest.**

In considering whether a TRO is in the public interest, "a court must at the very least weigh the potential injury to the public health when it considers enjoining state officers from enforcing emergency public health laws."[84]  The Court has considered that question above.  With the limited record before the Court, it is unclear how a gathering of cars in a parking lot is a danger to public health.  Admittedly, the record as it stands is sparse and one-sided.  But in that limited record, there isn't any evidence that On Fire's parking lot will prove more dangerous than the countless other parking lots that remain open.  Nor is there any evidence that churches are less essential than every other business that is currently allowed to be open – liquor stores among them.

Moreover, whereas the public may have no interest in Louisville's overbroad ban on drive-in church services, the public has a profound interest in men and women of faith worshiping together this Easter in a manner consistent with their conscience.  You do not have to share On Fire's faith to believe that celebrating that faith – while gathered together in praise of the One they believe healed the sick and conquered death – will bring hope to many in need of hope this Holy Week.

*      *      *

There is no instruction book for a pandemic.  The threat evolves.  Experts reevaluate.  And government officials make the best calls they can, based on the best information they have.

---

[84] *In re Abbott*, 2020 WL 1685929 *12 (5th Cir. Apr. 7, 2020).

Sometimes those government officials will disagree.  The Mayor of Louisville, in this case, wants to save lives.  The state Attorney General, to pick one example of an official who disagrees with the Mayor, surely shares the Mayor's concern for the public's health.  Neither has faced this situation before.  We all hope that we will never have to face anything like this again.  And neither leader, the Court feels confident, is acting with malice toward the physical or spiritual health of On Fire's congregation.

Some who read this Court's opinion will disagree with the Mayor.  Others will disagree with the Court.  And each camp will include some readers who share On Fire's faith, others whose conscience calls them to a different faith, and still others who profess no faith at all.  Each of them, believers and non-believers, deserves at least this from the Court: To know why I decided as I did.  You may not agree with my reasons, but my role as a judge is to explain, to teach, and perhaps, at least on occasion, to persuade.

The Christians of On Fire, however, owe no one an explanation for why they will gather together this Easter Sunday to celebrate what they believe to be a miracle and a mystery.  True, they can attempt to explain it.  True, they can try to teach.  But to the nonbeliever, the Passion of Jesus – the betrayals, the torture, the state-sponsored murder of God's only Son, and the empty tomb on the third day – makes no sense at all.  And even to the believer, or at least to some of them, it can be incomprehensible as well.

But for the men and women of On Fire, Christ's sacrifice isn't about the logic of this world.  Nor is their Easter Sunday celebration.  The reason they will be there for each other and their Lord

is the reason they believe He was and is there for us.  For them, for all believers, "it isn't a matter of reason; finally, it's a matter of love."[85] [86]

Justin R Walker, District Judge

United States District Court

4/11/2020

---

[85] Robert Bolt, *A Man for All Seasons* 141.
[86] JRW, SDR, & PBB.